IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

CLERK'S OFFICE U.S. DISTRICT COURT AT ROANOKE, VA
FILED
9/25/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

| | | |
|---|---|---|
| CATHERINE O., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 4:25-cv-00045 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | By: Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

---

Plaintiff Catherine O. ("Catherine") filed this suit seeking to overturn the Commissioner of the Social Security Administration's ("Commissioner's") final decision denying her claim for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–434. Catherine suffers from a number of serious ailments, including obesity, cervical spondylosis, fibromyalgia, migraines, asthma, allergic rhinitis, non-alcoholic steatohepatitis ("NASH"), cirrhosis, rheumatoid arthritis, major depressive disorder, bipolar disorder, and attention deficit hyperactivity disorder ("ADHD"). On review of her application for SSI, an administrative law judge ("ALJ") concluded that, despite these and other conditions, Catherine was not disabled under the Act because she had the capacity to perform light work, as that term is defined in the application regulations, subject to certain limitations. Catherine now challenges that conclusion. Because the ALJ failed to fully account for the potential effects of Catherine's migraines on her capacity for work, the court will remand for further consideration of this issue.

## I. STANDARD OF REVIEW

The Act authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted). Instead, the court, in reviewing the merits of the Commissioner's final decision, asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.* (internal quotation omitted), but not "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) has been working, (2) has a severe impairment that satisfies the Act's duration requirement, (3) has an impairment that meets or equals an impairment listed in the Act's regulations, (4) can return to past relevant work (if any) based on his RFC, and, if not, (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. RELEVANT PROCEDURAL HISTORY AND EVIDENCE

### A. Procedural History

On October 18, 2021, Catherine filed an application for SSI, alleging disability beginning on January 1, 2018. (R. 32, 229–37.) Her claim was initially denied on March 29, 2022. (R. 32, 99.) It was then denied upon reconsideration on December 29, 2022. (R. 32, 110.) Catherine requested a hearing before ALJ Brian Rippel on February 3, 2023. (R. 32, 134.) That hearing was held on April 9, 2024. (R. 57.)

In her application, Catherine alleged disability due to mental illnesses—bipolar disorder, depression, schizophrenia, anxiety, and ADHD—and physical ailments—blindness

or low vision, rheumatoid arthritis, psoriatic arthritis, asthma, and fibromyalgia. (R. 258.) She later added that she had been diagnosed with pre-diabetes. (R. 274.)

ALJ Rippel found that Catherine is not disabled, and denied her claim in a written decision on May 1, 2024. (R. 51.) The ALJ determined that Catherine suffers from a number of severe impairments, including bipolar disorder, major depressive disorder, ADHD, obesity, right ankle complex regional pain syndrome with surgery, left ankle tendonitis, lumbar degenerative disc disease with sciatica, cervical spondylosis with cervicalgia, fibromyalgia, migraines, asthma, allergic rhinitis, NASH, cirrhosis, rheumatoid arthritis in the right shoulder, and bilateral hand arthritis, as well as several non-severe impairments. (R. 34–36.) But the ALJ concluded that Catherine retains the residual functional capacity ("RFC") to perform light work subject to certain limitations. (R. 39–40.) The ALJ further determined that a significant number of jobs exist in the national economy that an individual with Catherine's age, education, work experience, and RFC can perform, he reasoned that she was not disabled within the meaning of the Act. (R. 49.)

Catherine subsequently sought review by the Appeals Council, which denied her petition on March 25, 2025, making the ALJ's decision the final word of the Commissioner. (R. 11.) On September 17, 2025, Catherine filed suit, seeking this court's review. (Compl. [ECF No. 1].)

## B. Legal Framework

A claimant's RFC is her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite her medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996)

(emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step [two] concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because the RFC is, by definition, "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work-related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"—including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1–2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explain how he weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that

evidence to his conclusion[s]," *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

**C. Medical Evidence**

Catherine suffers from myriad physical and mental ailments. But Catherine challenges the ALJ's assessment as it relates to only a few: migraines, major depressive disorder, bipolar disorder, and ADHD. (Pl. Br. at 10, 13 [ECF No. 16].) As noted below, the court finds that the ALJ erred by failing to fully explain how the RFC accounts for Catherine's migraines. The court will therefore summarize the medical evidence related to Catherine's migraines and only touch briefly on her many other conditions.[1]

In October 2017, Dr. Amanda Pallone diagnosed Catherine with allergic rhinitis, ADHD, depressive disorder, and asthma. (R. 1009–11; 1407–10.) Diagnoses for rheumatoid arthritis, positive antinuclear antibody, rheumatoid factor positive, and chronic left-sided low back pain without sciatica came the following month. (R. 1011; 1396–405.)

On December 21, 2017, Catherine was diagnosed with migraines after experiencing two types of headaches: a standard headache present across the forehead, and a "more severe" headache accompanied by "sound sensitivity and nausea" but without an aura. (R. 1393–94.) Dr. Pallone counseled her on ways to reduce the frequency of headaches. (*Id.*) On February 27, 2018, Catherine reported that her regular headaches and migraines were becoming more frequent. (R. 1368.) Dr. Pallone referred her to neurology for further treatment and evaluation.

[1] The court, however, has reviewed the full record.

(R. 1370.) On May 22, 2018, Catherine again saw Dr. Pallone after missing her referral to neurology. (R. 1356.) She stated that her headaches were occurring "about every other day" and that they were accompanied by sensitivity to light and sound. (*Id.*) Dr. Pallone prescribed a low dose of Topamax for the migraines. (R. 1357.) On June 22, 2018, Catherine reported that the Topamax had made her headaches worse, and that she had stopped using it. (R. 1341.) In its place, Dr. Pallone prescribed a low dose of Inderal. (R. 1344.)

On October 16, 2018, Catherine had a neurology appointment with Jessica L. Hammonds, CRNP, where she reported experiencing at least 8–10 headaches per month. (R. 1317.) She also reported having tried and stopped Depakote, Propranolol, Topamax, and Effexor for various reasons, maintaining that the most successful medication she had used was ibuprofen. (R. 1318.) CRNP Hammonds referred Catherine for Botox treatments. (R. 1320.) She received her first Botox treatment for chronic migraines on March 15, 2019. (R. 1295.) She had another neurology visit on August 26, 2019, at which she described a new "scraping" pain and refused Botox. (R. 1257.) She also described dizziness and hallucinations. (*Id.*) At her next neurology appointment on March 4, 2020, she described at least 15 headaches per month, each lasting at least 4 hours, and she requested to retry Botox treatment. (R. 1197.)

For the remainder of 2020, Catherine continued to attend regular appointments and see Dr. Pallone and others about various complaints, including her headaches. (*See generally* R. 1114–97.) On February 9, 2021, after discontinuing both migraine medications and Botox treatment, she sought another referral to neurology. (R. 1097.) Catherine saw neurology again on April 27, 2021, where she reported chronic headaches, about eight of which reached

migraine level each month, and which lasted for about eight hours. (R. 1070–73.) She was once again referred to Botox treatment. (R. 1073.)

She resumed Botox injections on May 25, 2021 (R. 1056), and had treatments on August 19, 2021 (R. 1027), November 16, 2021 (R. 1630), February 25, 2022 (R. 1603), and June 8, 2022 (R. 1880–81). Throughout this time, Catherine continued to see Dr. Pallone and other doctors for her ankle, cardiac, allergy, pain, and various other issues, but her headaches were rarely discussed. (R. 1011–27, 1598–655, 1813–825, 1859–909.)

On July 12, 2022, Catherine saw Gregory Bull, PA-C, for an assessment of her headaches and to review her Botox treatment plan. (R. 1859.) She told PA Bull that she had experienced a significant reduction in headache days since she began receiving Botox treatments regularly—from 18 headache days with 8 migraines to 8 headache days with 4 migraines.[2] (*Id.*) She received her next treatments on September 7, 2022 (R. 1837, 2032), January 13, 2023 (R. 2189), April 21, 2023 (R. 2113–14), and July 21, 2023 (R. 2389–90).

On August 8, 2023, Catherine saw PA Bull for another assessment. (R. 2378.) She reported a tingling sensation in her fingertips and some dizziness. (*Id.*) She also confirmed that her symptoms had been stable since the last assessment, with no increase in severity or frequency. (*Id.*) They planned to continue Catherine's treatments (*id.*), and Catherine received scheduled Botox injections on October 24, 2023 (R. 2337), and February 1, 2024 (R. 2532).

---

[2] Elsewhere in the assessment, PA Bull wrote that "[s]he is now having only 3 headache days per month." (R. 1860.) Considering PA Bull's notes otherwise state that Catherine experienced improvement of simply "greater than 50%," and Catherine's own words at the hearing, the court suspects that this is a typographical error and that 8 headache days is the more accurate figure. (R. 1859–60.) The ALJ appears to have accepted the same. (R. 44.)

At Catherine's next neurology appointment on February 16, 2024, she saw Marion Thomas, NP-C. (R. 2514.) NP Thomas noted that Catherine had many of the same concerns she expressed the prior August, including that she had had a stroke or that she would have a stroke soon. (R. 2514–15.) She described a recent episode during which she saw only "white with halos," experienced pain and disorientation, and tasted blood at the back of her throat. (R. 2515.) NP Thomas ordered a CT scan but indicated that this was more likely a complex migraine than a stroke. (R. 2517.)

**D. Opinion Evidence**

State-agency examiners Bert Spetzler, MD, and Sreeja Kadakkal, MD,[3] performed an initial review of Catherine's SSI application on March 28, 2022. They found that Catherine suffered from a few severe impairments—depressive, bipolar, and related disorders; fibromyalgia; migraine; cardiac dysrhythmias; lumbar spinal stenosis; and disorders of the skeletal spine—along with non-severe asthma. (R. 104.) Dr. Spetzler opined that Catherine was limited to lifting only 25 pounds occasionally and frequently, only occasionally climbing ramps or stairs, and never climbing ladders, ramps, or scaffolds. (R. 106.) He also opined that she should avoid concentrated exposure to extreme cold and avoid all exposure to fumes, odors, dusts, gases, and poor ventilation. (*Id.*)

Of her mental capacity, Dr. Kadakkal noted that, "[c]onsidering the severity of [Catherine]'s combined impairments it is reasonable that she would have some moderate limitations in concentrating for extended periods of time. She can attend to simple and

[3] Disability Examiner Catina Gilbert reviewed their conclusions. (R. 109.)

complex tasks for two-hour periods with occasional interruptions." (R. 107.) Dr. Kadakkal therefore concluded that Catherine was moderately limited in her ability to: maintain attention and concentration for extended periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and respond appropriately to changes in the work setting. (R. 107–08.) Still, Dr. Kadakkal explained that "[t]he total evidence in [the] file supports [that] although [Catherine]'s impairments are severe, she remains capable of simple, routine tasks with infrequent public interaction." (R. 108.) Because the examiners concluded that Catherine retained some RFC, they recommended a finding that she was not disabled. (R. 109.)

State-agency examiners Robert McGuffin, Jr., MD, and Joseph Leizer, PhD, reconsidered Catherine's SSI application on December 29, 2022.[4] (R. 110–22.) The reconsideration examiners found the initial decision "credible and useful" and concurred with its determinations of severe impairments as well as its conclusion. (R. 116.) On reconsideration, Dr. McGuffin further limited Catherine's exertional capacity and adjusted her postural and environmental limitations. (R. 118–19.) Dr. Leizer endorsed the same sustained concentration and persistence, social interaction, and adaptation limitations. (R. 107–08, 120–21.) Dr. Leizer also echoed Dr. Kadakkal's earlier observations about Catherine's focus, writing, "[s]he endorses issues with focus, memory, and following instructions, but has normal memory and attention/concentration at exams." (R. 121.) The reconsideration examiners

[4] Disability Examiner Stephanie Bright reviewed their conclusions. (R. 122.)

therefore agreed that Catherine retained some RFC and was therefore not disabled under the Act. (R. 122.)

**E. Testimonial Evidence**

On December 30, 2021, Catherine submitted a function report in support of her initial application. (R. 265–72.) In it, Catherine avers that she cannot sit or stand for long periods and that she can only lift five pounds at a time. (R. 270.) She also maintains that she cannot handle being around more than three people at a time and that she loses focus after only five minutes. (R. 265.) She explained that pain from her fibromyalgia and arthritis causes her to experience brain fog and tiredness, leading her to spend much of the day in bed. (R. 265–66.) She further contends that she cannot get along with others or follow simple instructions and that she struggles to remember how to do basic tasks. (R. 272.)

Catherine submitted a second function report on April 25, 2022, in support of her appeal. (R. 283–90.) In this second report, Catherine largely restated the same allegations found in her initial report. (*Id.*) She added that her depression and anxiety have gotten worse since the death of her grandmother in December 2021. (R. 283.) She also adjusted some of the information about her abilities; for example, in the new report, she alleges that she can stand for only five to ten minutes at a time, as opposed to 30, and that she can sit for only 20 to 30 minutes at a time. (R. 270, 288.)

On April 9, 2024, Catherine appeared for her hearing with ALJ Rippel. (R. 57–98.) She testified that she had recently been diagnosed with NASH, which causes chest pain, abdominal pain, and chronic fatigue. (R. 69–70.) She also testified that her arthritis and fibromyalgia pain cause her to experience a "usual pain [level of] about a six or a seven" out of ten, and even

simple tasks like cooking, cleaning, and crocheting are often impossible (R. 74–75, 80–82.) She further testified that she can walk for four or five minutes at most before experiencing neuropathic pain in her feet. (R. 77.) Catherine also explained that she can sit for no more than one to two hours and that she cannot stand still for more than five minutes at a time. (R. 78.) Her migraines, when treated with Botox, occurred only once every two weeks—an improvement from the previous two or three times per week. (*Id.*) Still, each "debilitating" migraine lasted for "seven to eight hours or more," and required Catherine to lie down in a quiet room. (R. 78–80.) She testified that none of the headache medications she had tried in the past had worked. (R. 79–80.)

Catherine also testified about her mental illnesses. Regarding her bipolar disorder, she testified that she has a "high irritability" that causes her to "break things, hit things, and yell." (R. 66.) She characterized her depression as "constant," and explained that her anxiety causes her to be unable to spend more than half an hour in a public space like a grocery store. (R. 66, 82.) She only mentioned her ADHD to explain that it had gone away when she was 17 years old and returned when she was 23 or 24. (R. 67.)

Christina Cody, a vocational expert ("VE"), also testified at the April 9 hearing. (R. 83–97.) In response to the ALJ's hypotheticals, the VE explained that a person with Catherine's RFC could perform various jobs at the light work level, such as collator operator (DOT code 208.685-010), marker (DOT code 209.587-034), or router (DOT code 222.587-038), and at the sedentary level, such as stuffer (DOT code 731-685-014), waxer (DOT code 779.687-038), or table worker (DOT code 739.687-182). (R. 86–87.) The VE further testified that any such jobs would not tolerate additional or unscheduled breaks, off-task behavior of over 15 percent

of the workday, or absenteeism of more than one day per month. (R. 87.) If an employee with Catherine's vocational profile needed extra breaks, was off task more than 15 percent of the time, or missed work more than one day each month, the VE testified, she would likely be unable to keep any of the listed jobs. (*Id.*) The VE also testified that, if the limitation to fingering and handling were reduced to occasional, every such job would be precluded. (R. 88.)

**F. The ALJ's Opinion**

The ALJ concluded that Catherine suffered from numerous severe impairments: obesity, right ankle complex regional pain syndrome with surgery, left ankle tendonitis, lumbar degenerative disc disease with sciatica, cervical spondylosis with cervicalgia, fibromyalgia, migraines, asthma, allergic rhinitis, NASH, cirrhosis, rheumatoid arthritis, rheumatoid arthritis in the right shoulder, bilateral hand arthritis, major depressive disorder, bipolar disorder, and ADHD. (R. 34. (citing 20 CFR 416.920(c)).) He also discussed a number of non-severe impairments—tachycardia, hypertension, hyperlipidemia, vitamin D deficiency, diabetes, gastroesophageal reflux disease, temporomandibular joint issues, dermatitis, and psoriasis—including their effects on each other and the severe impairments. (R. 34–36.) He found, however, that Catherine did not suffer from "an impairment or combination of impairments" that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 36.)

"After careful consideration of the entire record," the ALJ concluded that Catherine had the following RFC:

> [T]o perform light work as defined in 20 CFR 416.967(b) except with lifting and/or carrying up to 20 pounds occasionally and 10

> pounds frequently, standing and/or walking up to 6 hours and sitting up to 6 hours in an 8-hour workday. Additional limitations include only occasional balancing as defined in the SCO . . . , only occasional climbing ramps or stairs, stooping, kneeling, crouching, and crawling, no climbing ladders, ropes, or scaffolds, only occasional overhead reaching, only frequent handling or fingering with the bilateral upper extremities, and only occasional exposure to cold or heat extremes, vibration, respiratory irritants . . . , or workplace hazards . . . . She is limited to working in a setting no louder than a moderate noise environment . . . . Further, she is limited to only occasional overhead exposure to direct sunlight or bright, industrial lighting. She cannot perform work requiring a specific production rate, such as assembly line work or work that requires hourly quotas. She is limited to only occasional interaction with the public, coworkers, or supervisors, and she is limited to dealing with only occasional changes in a routine work setting.

(R. 39–40 (footnote omitted).) Considering Catherine's age, education, work experience, and RFC, the ALJ determined that Catherine could perform a job that exists in significant numbers in the national economy. (R. 50.) Therefore, the ALJ found, Catherine was not disabled under the meaning of the act from the alleged onset date of January 1, 2018, through the date of the decision. (*Id.*)

## III. ANALYSIS

Catherine challenges the ALJ's decision on two grounds. First, she contends that the ALJ's assessment is unsupported by substantial evidence because the ALJ "fail[ed] to include absences in the RFC assessment to accommodate [Catherine]'s severe migraines." (Pl. Br. at 10 [ECF No. 16].) Catherine argues that, because the RFC failed to account for her likely absenteeism resulting from continued migraines, which "would preclude competitive employment," the ALJ's determination was not based on substantial evidence. (*Id.* at 12.) Second, Catherine contends that the ALJ's RFC assessment is inadequate as it relates to her

mental limitations. (*Id.* at 13.) Specifically, Catherine argues that the RFC is not supported by substantial evidence because the ALJ "fail[ed] to adequately and fully account for [Catherine]'s concentration, persistence, and pace" at work. (*Id.* at 15.) The Commissioner opposes both arguments, maintaining that the ALJ's decision is based on substantial evidence. (Def.'s Br. at 5–13 [ECF No. 19].) Because the court agrees with Catherine as to the first argument, it does not reach the second.

When assessing an RFC, an ALJ must consider the limiting impacts of a claimant's physical and mental impairments. 20 C.F.R. §§ 404.1545(a)(1)–(3). When an ALJ considers an impairment with "[s]ymptoms [that] cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must conduct a unique, two-step analysis in evaluating those subjective complaints. SSR 16-3p; *see also* 20 C.F.R. § 404.1529(a); *Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020). At the first step, the ALJ must consider "whether objective medical evidence presents a 'medically determinable impairment' that could reasonably be expected to produce claimant's alleged symptoms." *Arakas*, 983 F.3d at 95 (quoting 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). Here, ALJ Rippel found that Catherine's migraines were a medically determinable impairment that could reasonably be expected to cause her symptoms, so he proceeded to the second step. (R. 41.)

At the second step, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to determine the extent to which the symptoms limit an individual's ability "to perform work-related functions." SSR 16-3p, 2016 WL 1119029, at *2. At this stage, the claimant may rely solely on subjective testimony or evidence to establish his impairment, *Hines*, 453 F.3d at 565, and objective evidence is not required to find the claimant disabled, *see* SSR

16-3p 2016 WL 119029, at *4–5 ("Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques."). Accordingly, under *Arakas*, the ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate' them." 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *4–5). The ALJ, however, "is not required to accept the claimant's statements at face value; rather, the ALJ must 'evaluate whether the statements are consistent with the objective medical evidence and other evidence.'" *Piacitelli v. O'Malley*, No. 7:22-CV-193-FL, 2024 WL 996740, at *6 (E.D.N.C. Feb. 12, 2024) (quoting SSR 16-3p, 2016 WL 1119029, at *6); *see also Craig v. Chater*, 76. F.3d 585, 595 (1996) (explaining that the ALJ must consider whether a claimant's subjective complaints could "reasonably be accepted as consistent with the objective medical evidence and other evidence"), *superseded by statute on other grounds.*

Here, the ALJ evaluated Catherine's migraines in two paragraphs. In the first, he stated that Catherine "responded well to treatment," chronicled her Botox treatments, and explained that, aside from some "seizure[-]like symptoms," she continued to experience fewer migraines than she had before starting Botox. (R. 44–45.) In the second, he stated simply that "the records indicate the claimant has migraines, with normal examinations, and reported significant improvement with Botox injections. . . . [L]ight work with work in a setting no louder than a moderate noise environment and only occasional overhead exposure to direct sunlight, or bright, industrial lighting would fully accommodate [Catherine's] migraine headaches." (R. 45.) This discussion insufficiently evaluates the impact of Catherine's migraine symptoms on her capacity for work because it ignores the possibility of an intolerable level of

absenteeism. (*See* R. 87 (noting that the jobs cited by the VE would not have any tolerance for additional or unscheduled breaks, off-task behavior of over 15 percent of the workday, or absenteeism of more than one day per month).)

It is possible that the ALJ discounted Catherine's account of her migraine symptoms. He stated at the outset of his analysis that her "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (R. 41.) But that statement was made broadly about Catherine's range of ailments, and was not cabined to her migraine symptoms. Furthermore, the ALJ later noted some specific inconsistencies between her statements and the medical evidence, including that her testimony alleged an inability to walk for more than five minutes and chronic abdominal pain despite both being nearly absent from the notes to her examinations. (R. 47.) Moreover, he pointed to no specific inconsistencies between Catherine's migraine testimony and the objective record. As a result, this court has no way of knowing if the RFC depended on his having discounted the veracity of her migraine testimony, and specifically how often her migraines rendered her debilitated for a full workday.

Furthermore, Catherine's reports of her migraine symptoms *were* consistent. For years, she reported having frequent, debilitating migraines. (R. 1070–73, 1197, 1257, 1317, 1356, 1368, 1393–94.) She began receiving Botox treatments consistently in 2021 (R. 1056), and in 2022, she reported that she had seen over a 50 percent decrease in symptoms. (R. 1859.) She continued to receive Botox injections up to the date of her hearing. (R. 1027, 1603, 1630, 1837, 1880–81, 2113–14, 2189, 2389–90, 2337, 2532.) At her hearing, she reported a further

decrease: only one migraine every two weeks. (R. 80.) If the ALJ found that evidence inconsistent, he did not explain why.

Defendant asserts that Catherine "has not identified any evidence indicating she continues to experience migraines with a frequency or severity that would require additional RFC limitations, including any allowances for excessive work absences." (Def.'s Br. at 10 [ECF No. 19].) But Defendant is incorrect. The fact that "Botox aided with her symptoms" does not mean she had no symptoms. (*Id.*) Even two migraines per month could risk placing Catherine above the tolerable level of absenteeism indicated by the VE. (*See* R. 87.) And while this court will not weigh the evidence itself, it cannot review the ALJ's reasons for not including a limitation addressing that possibility because the ALJ did not provide any.

Other courts have remanded cases in similar circumstances. *See Trevin C. v. Bisignano*, No. 2:25-cv-298, 2026 WL 2035900, at *11–13 (E.D.V.A. June 2, 2026) (collecting cases where ALJs failed to account for migraine-related absenteeism), *report and recommendation adopted*, 2026 WL 2034467 (E.D.V.A. July 14, 2026); *Trimyer v. Bisignano*, No. 5:24-cv-720, 2026 WL 622688 (E.D.N.C. Mar. 5, 2026) (remanding where "it [was] unclear how the ALJ accounted for Claimant's migraines in formulating the RFC" because "although the ALJ summarize[d] the evidence of Claimant's migraines in the opinion, there [was] no narrative discussion to indicate how the ALJ determined the migraines impacted her ability to work"); *Victor R. v. Colvin*, No. 1:24-cv-205, 2025 WL 33699, at *8 (M.D.N.C. Jan. 6, 2025) (recommending remand where the claimant testified to at least one debilitating migraine per week, "plac[ing] the issue of migraine-related time off-task and absence squarely before the ALJ," and the ALJ "failed to 'identify evidence that supported the omission of [related] limitations'" (quoting *Woods v.*

*Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018) (cleaned up))), *report and recommendation adopted*, 2025 WL 307347 (M.D.N.C. Jan. 27, 2025).

In *Trevin C.*, for example, the claimant described migraines that occurred four times per month, lasted one to five hours, caused nausea, dizziness, and light sensitivity, and forced him to lay in bed with a specific sound frequency playing on his phone and an ice pack on his head. *Trevin C.*, 2026 WL 2035900, at *10. The ALJ determined that environmental limitations sufficiently accounted for his migraines because of the claimant's "reports of improvement with treatment, reports of participating in daily activities, and intact neurological exam findings." *Id.* at *11. But the district court disagreed and remanded, stating, "The ALJ failed to address how the RFC limitations account for potential absences or extended time off task because of migraines, which is especially relevant given the VE's testimony that work would be precluded for someone who missed more than 1.5 days per month." *Id.* at *13.

This case is similar. The VE here testified that "an employer would tolerate one absence or less per month," including if the employee were to come in late or leave early. (R. 87.) Yet in the two relevant paragraphs, there is no discussion of Catherine's testimony about the migraines, including her description of them as "debilitating" or her claim that they require her to lie down in a dark, quiet room until they go away. (R. 44–45, 79–80.) There is little evaluation of their persistence and intensity—just the acknowledgement that Botox has made them less frequent. (*Id.*) And most importantly, there is no logical connection drawn between the RFC, the VE's testimony about absenteeism, and the biweekly occurrence of severe migraines. (*Id.*) In other words, the ALJ failed to address how the light and noise limitations sufficiently account for Catherine's potential absenteeism due to her migraines, and the court

is "left to guess about how the ALJ arrived at his conclusions." *Mascio v. Colvin*, 780 F.3d 632, 637 (4th Cir. 2015).

It is true that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence." *Thomas v. Berryhill*, 916 F.3d 307, 312 (4th Cir. 2019) (quoting *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)). And the court is unconvinced by Catherine's suggestion that the ALJ "cherrypicked" evidence that supported his conclusion. (Pl. Br. at 11 [ECF No. 16] (quoting *Lewis v. Berryhill*, 858 F.3d 858, 869 (4th Cir. 2017)).) Still, the ALJ must "build an accurate and logical bridge from the evidence to his conclusion." *Monroe v. Colvin*, 826 F.3d 176, 189 (2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)). The ALJ did not complete that bridge here, so the court will remand the case for further consideration.

## IV. CONCLUSION

For the foregoing reasons, the court will remand the ALJ's finding that Catherine is not disabled.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 25th day of September, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE